UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

    *Plaintiff*,                    CASE NO: 08-CR-20599

*v.*                                           DISTRICT JUDGE THOMAS L. LUDINGTON
                                               MAGISTRATE JUDGE CHARLES E. BINDER
STEVEN PAUL WALTON,

    *Defendant.*
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
ON THE GOVERNMENT'S MOTION FOR INVOLUNTARY MEDICATION**[1]
(Doc. 23)

**I.     REPORT**

    **A.     Background**

This above-entitled motion was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A). The government and defense counsel filed a "Stipulation Regarding Applicable Standard and Factual Determinations" on September 16, 2009. (Doc. 22.) In the stipulation, the parties agree that "the mental competency report of Dr. Harold S. Sommerschield, as well as the forensic evaluation of Drs. Ralph Newman and Adeirdre Stribling, . . . provide a sufficient basis" for the court to make its determination and that the aforementioned doctors "would testify consistent with their respective reports" if called to testify. (Doc. 22 at 3.) Thus, the parties agree to the admissibility of the reports in lieu of live testimony. (*Id.*) In addition, although not clear from the heading given the stipulation, "both the government and defendant

---

[1]This Report and Recommendation is filed because at least one Circuit has held that an "order authorizing involuntary medication is dispositive of a claim or defense of a party, and therefore, under *Maisonville* [*v. F2 America, Inc.,* 902 F.2d 746 (9th Cir. 1990)], it is not among the pretrial matters that can be fully delegated to the magistrate judge under § 636(b)(1)(A)." *United States v. Rivera-Guerrero*, 377 F.3d 1064, 1069 (9th Cir. 2004).

concur in the request for involuntary medical treatment and request that the [] court order the imposition of such treatment to render the defendant competent to stand trial." (Doc. 22 at 4.) Although the stipulation addresses the ultimate judicial finding, in order to fully protect Defendant's constitutional rights, a hearing was held on September 22, 2009, with government counsel, Defendant, and defense counsel present. Therefore, this matter is ready for Report and Recommendation.

### B. Motion Standards

The decision whether to involuntarily medicate a defendant for the purpose of restoring competency is "'so substantial as to require the government to prove its case by clear and convincing evidence.'" *United States v. Payne*, 539 F.3d 505, 509 (6th Cir. 2008) (quoting *United States v. Green*, 532 F.3d 538, 545 (6th Cir. 2008)).

In *Sell v. United States*, 539 U.S. 166, 123 S. Ct. 2174, 156 L. Ed. 2d 197 (2003), the Court held that although a defendant has a constitutional right to refuse medical treatment, "the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial." *Id.* at 179-80. "A *Sell* order requires the government to present clear and convincing evidence of the following: (1) the existence of an 'important' government interest; (2) that involuntary medication will 'significantly further' the government interest; (3) that involuntary medication is 'necessary' to further those interests; and (4) that administration of the drugs must be 'medically appropriate' for the individual defendant." *Green*, 532 F.3d at 545.[2]

---

[2] I note that in this case, as in *Green*, the parties have stipulated that the appropriate standards are set forth in *Sell* and *Green;* thus, the government was not required to explain why it was not seeking involuntary medication on grounds discussed in *Washington v. Harper*, 494 U.S. 210, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990) (used when the pretrial detainee is a danger to himself or others), nor is this Court required to make any finding as to why it applied the *Sell* standard. *Green*, 532 F.3d at 545 n.6.

**C.     Analysis**

**1.     Important Government Interest**

Under the first *Sell* factor, when determining whether a crime is sufficiently serious to represent an important government interest, courts have looked to the statutory penalty and the guideline range of imprisonment which may be imposed. *Green*, 532 F.3d at 547-48, 550 (ten-year statutory minimum and maximum life sentence provides a sufficiently important government interest regardless of whether crime was violent or involved persons or property); *United States v. Evans*, 404 F.3d 227 (4th Cir. 2005) (maximum statutory penalty of ten years warrants finding that crime is serious enough to constitute an important government interest). Courts should also consider whether there are any "special circumstances which 'lessen the importance of that interest' such as a 'lengthy confinement in an institution for the mentally ill – and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime' or 'the possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed . . ." *Green*, 532 F.3d at 551. Another special circumstance may arise "where a defendant suffer[s] from a severe mental illness both at the time of the alleged crime and the time of hearing, [such that] the government interest in prosecuting . . . [is] not sufficient to merit involuntary medication" because a verdict of "not guilty by reason of insanity" would be likely to result. *United States v. Sheets*, No. 3:07-CR-68, 2008 WL 4614330, at *3 (E.D. Tenn. Oct. 15, 2008).

In the instant case, Defendant is charged with failure to register as a sex offender under 18 U.S.C. § 2250, which carries a maximum penalty of imprisonment for 10 years. I therefore suggest that the government does in fact bring forward a significant interest. Although Defendant has been incarcerated for some months, when compared to the maximum penalty Defendant faces, I cannot

3

say that Defendant's confinement thus far is so lengthy as to negate the Government's legitimate interest in prosecuting this case. While there is clear indication that Defendant suffers from mental illness, in light of the treatable nature of his illness, as explained in greater detail below, I do not believe that Defendant's mental illness is so severe that it would necessarily result in a verdict of "guilty by reason of insanity" should the case go to trial. I thus suggest that the government has met its burden as to the first *Sell* factor.

### 2.  Furthering the Government's Interest

Under the second *Sell* factor, the "court must find that 'administration of the drugs is substantially likely to render the defendant competent to stand trial' and that 'administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair.'" *Green*, 532 F.3d at 552 (quoting *Sell*, 539 U.S. at 181). Certainty is not required; rather, the question is whether there is a "substantial probability" that the proposed treatment plan would restore competency. *Payne*, 539 F.3d at 510.

In the instant case, the parties have stipulated to admission of a seven-page mental competency report authored by Harold S. Sommerschield, Ph.D., and a fifteen-page Forensic Evaluation ("evaluation") by Ralph Newman, M.D., and Adeirdre Stribling, Ph.D. (Doc. 22 at Exs. A & B.) Both reports consist of findings made after a series of tests were performed. Dr. Sommerschield found that Defendant understood the charge against him and possessed a basic understanding of the legal process. (Doc. 22, Ex. A at 2.) In his report, Dr. Sommerschield explained his colloquy with Defendant regarding whether he thought he could assist his attorney in his defense:

> [Defendant] verbalized "I can assist my attorney in my defense. It would breach national security, because of 'direct viewing.' The US does it." Since I didn't understand "direct viewing," I asked him to explain what he was talking about. He stated that "when I sleep, I pass information. A lot of it comes true." He verbalized that he was "precise in passing information," "but only to do good things." He went on to say, "I scan areas; others see things in different parallels." He apparently has recognized that a huge amount of nerve agents had disappeared from storage. He believes that this has been done by a neo-Nazi group. He claimed that he had talked to Presidents Bush, President Clinton and on one occasion, to President Obama. Then he again reiterated that he does this in his sleep. He believed that the neo-Nazi group and its partners are building a tunnel under the mountains to New York. He also thought the neo-Nazis were planning to put nerve grass [sic] in catalytic converters.

(Doc. 22, Ex. A at 3.) Defendant informed Dr. Sommerschield that although he was supposed to have registered as a sex offender after leaving Alabama, he did not do so because "when he has registered 'the neo-Nazi started attacking me.'" (*Id*.) He also stated that if he doesn't register, they won't find him, and that he was "afraid to register." (*Id*.) Defendant believes that his current charges are designed to bring him back for some other purpose and that "the neo-Nazis work in a parallel connected to the state and prison system." (*Id*.) "Mr. Walton emphasized that he works for national security in a parallel during his sleep . . . [and that] people are chasing him in the parallel . . . [but that] 'no one is chasing [him] in the physical.'" (*Id*.)

The forensic evaluation report states that Defendant has delusions that consist of "grandiose and persecutory beliefs" that "he was a high level government agent who had a 'gift' of having a 'third eye,' allowing him to travel into parallel reality in his sleep, where he is able to uncover wrongdoing and communicate and possibly advise, people in positions of authority, such as politicians and entertainers." (Forensic Eval., Doc. 22, Ex. B at 4.)

Dr. Sommerschield found Defendant to be "pleasant" with a "normal appearing external persona," but concluded that he "is delusional and believes that his delusional beliefs are true," even though he recognizes that his "direct viewing" is "bizarre." (Doc. 22, Ex. A at 5.) Dr.

5

Sommerschield stated there was "no disorganization noticed in his overt functioning, other than when he was talking about his delusional beliefs." (*Id.*)  The forensic evaluation similarly affirmed that Defendant is "pleasant and engaging" and "has been helpful with being emotionally supportive to those who are lower functioning."  (Doc. 22, Ex. B at 5.)

Dr. Sommerschield found that Defendant is of average intelligence (Ex. A at 5), does not suffer from ADD, ADHD, or organicity, and does not exaggerate the severity of his condition.  (*Id.* at 6.)  The doctor further found that, "[a]lthough he has average intellectual ability, he will not be able to utilize his intellectual ability effectively in confronting his psychotic symptoms.  His psychosis can interfere with his ability to adjust to reality and cope with the demands of reality."  (*Id.*)  Dr. Sommerschield concluded that Defendant "will not be able to talk about his Failure to Register in an objective and logical manner [because] [h]is Failure to Register is enmeshed with his psychosis and the result of delusional thinking . . . [and therefore] I don't believe that Mr. Walton will be able to separate out the delusional aspects associated with his failure to register in order to assist his attorney in his defense."  (*Id.* at 7.)  Dr. Sommerschield diagnosed Defendant with "Paranoid Schizophrenia, 295.30." and found Defendant to be "mentally incompetent."  (*Id* at 6.*)*

The conclusion of the forensic evaluation similarly is that Defendant's "mental condition significantly interferes with his rational understanding of relevant legal proceedings, his ability to assist counsel in his defense, and comprehending the available pleas," including a plea of "not guilty by reason of insanity."  (Ex. B at 8.)  The evaluation gives a diagnosis of "Delusional Disorder, Persecutory and Grandiose Type, 297.1," but finds that Defendant does "not meet the criteria for Schizophrenia since he does not have a prominent thought disorder, deficit symptoms, hallucinations or bizarre/disorganized behavior."  (Ex. B at 7.)  It concludes that "Mr. Walton

6

requires treatment with antipsychotic medication, . . . that no less-intrusive alternatives are available to address his needs . . . [and that] there is a substantial probability his competency status can be restored with a period of treatment with antipsychotic medication." (*Id*. at 13.) The evaluation adds that Defendant "has refused psychotropic medication, stating that he has no mental illness and has been erroneously diagnosed in the past. He has made it clear that under no circumstances will he consent to psychotropic medication and believes that it will interfere with his 'gift.'" (Ex. B at 5.)

The evaluation indicates that the "[p]rognosis for improvement is good with treatment to include antipsychotic medications" because Defendant has "no past history of treatment failures on antipsychotics, a lack of deficit symptoms of psychosis to include flat affect, impoverished speech, and neglect of self-care, no organicity, and good premorbid functioning." (*Id*. at 7-8.) The evaluation further states that "[p]oor prognostic indicators include risk of non-compliance, lack of insight into his mental illness and co-morbid alcohol abuse." (*Id.* at 8.) The conclusion is that "there is a substantial likelihood that with appropriate treatment, he may improve to such an extent his competency to proceed may be restored." (*Id*.) The evaluators indicate that the proposed antipsychotic medication can "produce beneficial clinical effects such as reducing the intensity and preoccupation with delusional ideation . . . [which] can also contribute to an improvement in social, occupational and academic functioning." (*Id*. at 9.) The evaluation further noted that "[a]ntipsychotics are commonly used by the psychiatric community who are familiar with their side effects and safely manage them in the course of daily practice" and that such monitoring would be provided to Defendant and adjustments would be made to manage any side effects manifested. (*Id*.)

7

Since Defendant is refusing treatment, the evaluators indicate that they "would rely on a long acting injectable antipsychotic . . . [such as] Prolixin decanoate, Haldol decanoate, and Risperdal consta. " (*Id*. at 10.) Defendant was previously treated with a short-term dosage of Risperdal "with good tolerability." (*Id.*) Tardive dyskinesia is the most significant potential side effect of the proposed medication because it is the only one that is not reversible with discontinuation of the medication. Tardive dyskinesia consists of involuntary motor movements most commonly around the perioral region. The doctors would begin with a trial dosage of Risperdal because of Defendant's past tolerance and because it has an "almost negligible risk of tardive dyskinesia, . . . approximately 1% over the entire course of treatment." (*Id*. at 10.) The evaluation notes that earlier antipsychotic drugs carried far greater risk of tardive dyskinesia. (*Id.*) Other potential side effects of Risperdal include "modest weight gain, hyperglycemia, hyper lipidemia, and elevated prolactin." (*Id*.) Weight gain is usually "no more than 10 pounds" and weight would be monitored. (*Id.*) The hyperglycemia noted "occurs in a significant minority of patients treated with Risperdal and is reversible with discontinuation [that] [r]arely result[s] in diabetes or present with life threatening hyperglycemia." (*Id.*) Defendant would be monitored as to this potential side effect and the potential hyperlipidemia as well. (*Id*. at 10-11.) The potential for elevated prolactin is "not clinically significant" with respect to Defendant because it is more likely to occur in women at risk for osteoporosis. (*Id*. at 11.) With respect to the overall management of Defendant's care, the evaluation indicates that if Defendant were to "have a suboptimal response to Risperdal consta," "then Prolixin decanoate or Haldol decanoate would be considered." (*Id*.) The evaluation details the potential alternative treatment, dosages, side effects, and methods that could be used to minimize any side effects. (*Id*. at 11-13.)

I therefore suggest that the medical evidence proffered by the parties proves, by clear and convincing evidence, that administration of drugs is substantially likely to render Defendant competent to stand trial and is substantially unlikely to have side effects that will interfere significantly with Defendant's ability to assist counsel.

### 3. Medical Necessity

Under this factor, the Court must find that any alternate less-intrusive treatments are unlikely to achieve substantially the same result. *Sell*, 529 U.S. at 181. Defendant has expressed a staunch refusal to submit to any medication because he does not believe he has any mental illness and he worries medication would interfere with his gift. In addition, the evaluation concludes that "Mr. Walton requires treatment with antipsychotic medication and that no less-intrusive alternatives are available to address his needs." (Forensic Eval., Doc. 22, Ex. B at 13.) I therefore suggest that it has been established by clear and convincing evidence that less-intrusive treatments are unlikely to achieve substantially the same results.

### 4. Medically Appropriate

Finally, the Court must find that administration of the medication is medically appropriate, *i.e.*, in the defendant's best medical interest in light of his medical condition. *Sell*, 529 U.S. at 181. The medical evidence in this case establishes that Defendant has great potential, which is hindered by his delusions. The medical evaluation thoughtfully details the rewards and risks of treatment and sets forth a plan that includes the monitoring of any side effects and a commitment to adjust treatment whenever needed. I suggest that the medical submissions prove by clear and convincing evidence that the proposed treatment is in Defendant's best medical interest in light of his condition.

## II.    RECOMMENDATION

For the reasons set forth above, **IT IS RECOMMENDED** that the Government's Motion for Order for Involuntary Medical Treatment be **GRANTED.**

## III.    REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co.,* 454 F.3d at 596-97.  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

                                             s/ *Charles E Binder*
                                             CHARLES E. BINDER
Dated: September 25, 2009                  United States Magistrate Judge

### CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  September 25, 2009                          By     s/Mimi D. Bartkowiak
                                                                                 Law Clerk to Magistrate Judge Binder